Our next case for argument is Black Card v. Visa. Good morning, Your Honors. Paul Clement for the Appellant Black Card. I'll endeavor to save three minutes for rebuttal. This is a case that should have plainly gone to the jury. Black Card undeniably had a direct contractual relationship with Visa until at least the end of 2013. Black Card then continued to seek market approval from Visa and provide valuable services to Visa. well into 2014 while being assured that it was business as usual until a new contract could be negotiated. There is no question that Black Card's efforts were valuable to Visa. Visa paid Black Card under the old agreement and they offered money under a new agreement and a new agreement was eventually reached with MasterCard that compensated for that contract. Are you arguing basically their implied contract? Yeah. The way that we look at this, Judge Briscoe, is that in late December, the relevant conduct here is from essentially December 2013 through 2014. In December 2013, you still have an express contract. In 2014, we believe there's an implied contract from that point basically on the terms of the prior agreement. Wasn't Black Card told, probably told once you got into 2014, that this is the last payment that we're giving you under our agreement and our agreement ends or has ended the end of December 2013? They were told that, right? I think exactly what they were told is important. They were told in an email in I think February of 2014 that this is your last payment under the expired agreement, which of course is true, but it doesn't go further and say and you're going to get no further money from us until we ink the deal with new terms. And if they'd added that last part, the testimony of my client is that we would have walked away from the deal at that point. And I think the other key exchange to put all this in context is in December of 2013, and this is Appendix 251 if you want to look at it, but in December of 2013, my client asks Visa, where's the new language that's going to govern in 2014? And he's told, well, it's basically done, we've got to get it by legal, but it's business as usual in the interim. Now, my client certainly relied on that statement. But soon thereafter, I mean, really soon thereafter, weren't there negotiations? I mean, these parties were working out trying to determine what their agreement would be going forward. That's true, but there was continued performance while they were negotiating over the terms of the new agreement. And I think that, you know, there's obviously two ways to understand what's happening here. One way, I suppose, is to think that, look, you know, they're in sort of a no contract situation at all in early 2014, and they're negotiating a new term, but there's no existing contractual relationship. We don't think that's the case at all. We don't think that's consistent with the business as usual promise. We don't think that's consistent with the way that the parties are interacting with each other. I think it's very telling, for example, there's this back and forth that starts on December 16, 2013, and continues through January 17, 2014. The beginning of that is the basis for our breach of the express contract claim. But what's interesting about that interaction, it's a back and forth about the same marketing materials. Now, how is that a breach, if you want to get to the express contract? How is that a breach? When they are given a change in the language, that is, Visa is given a change in the language, and they have, under the express contract, 10 business days in which to either say it doesn't work, or if those 10 business days pass, then it's accepted. Right? Isn't that the term of the express contract? Those are the terms under the express contract. The problem is, on December 16, with the original materials that we submit on December 16, they say, hold the presses. You can't run those. Right. And that's what we focus on as being the unreasonable withholding of approval for the marketing materials. But they were ultimately used, were they not? No, not those materials. They were substantially modified. So, what happens is, December 16, we submit the materials we want to use, and we're told, no, hold the presses. Then, four days later, we submit substantially modified materials, and those are ultimately approved on January 17. But our beef is with the non-approval, the refusal, of the December 16 materials. But didn't they have that leeway within the express contract? Didn't they have 10 days to say yay or nay? Sure, but they said nay. That's the key thing. And once they say nay, if they're saying nay is unreasonable, that's a violation of the contract. So, your concern here on the express contract is really delay, delay in approval. No, actually, it's not. It's the immediate rejection. We don't have a beef. I mean, we do have a beef on the implied contract about sort of being strung along in the delay. But didn't you immediately make revisions in the effort to try to get this moving on? And it was submitted to Barclays, right? And then Barclays went to Visa and said, how's this look? And then that is when they're in their time to either say yes or no again, because now we have a revised marketing. Sure, but none of that has anything to do with whether their refusal for the different December 16 materials was reasonable. Okay. That's the question we think we should have gotten to the jury on. But what I think is telling about that whole exchange is it all takes place on both sides of 2014. Counsel, I've got to stop you there. So did you bring the stop the presses expressly to the attention of the district court? I'm concerned that you may have waived this argument. Okay, we don't think we waived it. I mean, what happened is we specifically cited that email. It's Exhibit 35. Right, but you did that in the statement of facts. Is that not correct? We did it two places. We did it in the statement of facts, and then in our two-paragraph argument about the breach of contract, we cite back to the statement of facts. Right, but did you say in the brief, in the merits, hold the presses is the key point of the contract breach? No, we didn't. We didn't quote the email. That's the part I'm worried about. How would the district court understand from reading the brief in the merits? I understand it says Exhibit 35. But isn't, I mean, I think I just heard you say hold the presses is the key point. So weren't you obligated to say hold the presses is the key point here, trial court? I don't think so, Your Honor, and what I would say is if you look at the brief, when we, in the statement of facts, when we say that the approval was unreasonably withheld in December 2013, we cite one and only thing for that. It's Exhibit 35. But you don't say hold, you don't say hold the presses. No, but that Exhibit is the hold the presses email. So, I mean, look, it would have been nice if we put a parenthetical that said hold the presses. Well, I mean. But I don't think that makes a waiver. But I, okay. I get that. But how would you assume a point of a breach without the hold the presses statement being brought to the attention to the district court? Well, again, it was brought to their attention. It was the only exhibit we cited for the proposition. Did you argue before the district court hold the presses? No, but we were asked. I mean, we had an unfortunate exchange with the district court where he said, you know, what specifically are you relying on? The counsel. Right. So they posed. Right. And the counsel said I don't have it right in front of me. But I, you know, you'll obviously have to decide whether that constitutes a waiver or not. But Exhibit 35 is cited in the two relevant places. And where we specifically say that approval was unreasonably withheld, it's the only thing we cited. Yeah, but is that the normal approach? I mean, you have to admit that isn't the way to go here. I mean, if you're going to make an argument and tell the district court what you think the problem is and what the support is for your express contract claim, don't you have to bring that forward and not bury it in an exhibit and say, well, I hope the court reads every last inch of this pleading? Your Honor, just one last thing about this, because I don't want to get completely bogged down on this. What I would say is the following. You've got to take all this in context. This is a word-limited briefing before the court. The entire breach of contract argument is two paragraphs. Yeah. And this is cited there. Okay. You know, would I have done it differently? It's repeating. You know, with the benefit of hindsight, sure. But especially coupled with the express question by the trial court. Again, but the answer wasn't we don't have anything. The answer was I don't have it here, Your Honor. And, you know, that's not a denial of not having evidence. That's a just it's not here. It's unfortunate. But I don't think it's a waiver. Okay. Thank you. But the only point I really wanted to make is about this point is that when the calendar turns to January, nobody who's a party to this, not Visa, not Black Card, not Barclays, nobody says, hey, we've got to proceed completely differently here now because it's January. Nobody points to the expiration of the promotional agreement as being a fact that changes the approval process or really anything else. And I think in thinking about this case, there's two things that are critical. In 2014, two things are happening. One is the approval process is taking place exactly as it was under the promotional agreement. Now, Visa has a suggestion that, well, maybe it would be the same under the brand standards program even in the absence of a promotional agreement. Now, there's two critical responses to that. One is, at best, that's an argument for the jury. The second thing is the record doesn't bear out that as the understanding of the parties. When the parties are putting these materials back and forth in December in 2014, there are multiple references, including as late as November 2014, to the business as usual procedures. So that's how they're understanding that continuing performance under a contract. The other thing that I think is critical is that Black Card is continuing to do something that's incredibly valuable from Visa's perspective, which is they're continuing to market this product, which gets high net worth individuals using the Visa network. Now, there's no question that is tremendously valuable to Visa. That's why they were willing to pay for it under the promotional agreement, willing to offer even more money going forward, and why MasterCard was willing to pay a lot of money for that privilege as well. And don't we, now that you bring up MasterCard, don't we look at the actions of your client to negotiate with MasterCard and when those negotiations began? Wouldn't that be an indication that we are done with Visa and we are moving on and looking at MasterCard? So two points, Judge Briscoe. First, at best, that suggests that maybe at some point in 2014, like May or June, the implied contract ended. I mean, that's at most you get out of that proposition. But the second thing I would say is it's just wrong to say anything we were doing by discussing things with MasterCard was a breach of that agreement. I mean, at a certain point, we're continuing to negotiate over a new agreement with Visa.  I'm saying it would cut against your argument that you're living and working under an implied contract when you seem to be headed off into another direction. Well, I don't think that just sort of doing some contingency plannings would be enough to deny the implied contract. And again, I think the things that are critical is that even after we start talking to MasterCard, we're still running by the marketing materials under business-as-usual procedures. And shouldn't you? I mean, really, we're talking about a trademark here that's pretty valuable. I mean, you would do that just as a good business person. No, we would not, Your Honor. No, we would not, Your Honor. Not in the way we were doing it. We would not maybe do something radically new with the trademark, but the way that the agreement worked, we had to run every – if you look at the contract. Any time you use the word Visa, they had to see it. In any way. In any piece of promotional material, in any point-of-sale display, anywhere we have to use it, we need to use it. That is not something we would do just based on their trademark. And again, if they want to go to the jury and say they weren't doing this because there was an implied contract, they were doing it because of the trademark, fine argument to make to a jury. I was going to hope to reserve my time for rebuttal, if that's okay. Thank you.  Good morning. Good morning. May it please the Court, I'm Shannon Stevenson on behalf of the Appellee Visa USA, Inc. The thrust of Black Card's appeal here is that Visa promised that it would continue to make incentive payments to Black Card under the promotional agreement after that agreement had expired. But Visa made no such promise. How about business as usual? Right. So let's go to that category of the business-as-usual communications. Black Card depends almost exclusively on one email, and that was from February 10, 2014. And that email simply cannot constitute the kind of clear manifestation of intent to continue this entire promotional agreement. When you look to the words of that email, what it says is, Hi, Scott, please proceed in marketing business as usual until we have a chance to discuss. Continue to run your materials through Barclays for review and approval. So first of all, there's no promise contained in that email at all. It's just a request to do something. Well, I know, but what does the term business as usual mean? Doesn't that mean we're going ahead like we've gone? We're continuing. Does it not mean that? It does not mean that. Okay. It's specific to marketing. Because he says, please proceed in marketing business as usual. But wasn't that really the core of the dispute between the parties, was the marketing? I would disagree with that, Your Honor. Okay. Just to finish the thought on that particular email. He then says, continue to run materials past Barclays for review and approval. So this is a really specific request. It is by no means, let's continue all aspects of the promotional agreement, including our obligation to make incentive payments, just as we've been doing. You just can't cram all of the details that would be included in a full renewal of the promotional agreement into that one email. But what was said does mirror and does track exactly what the parties had done before. Well, let me step back on that, because I think it's really important here to distinguish what the specific obligations were under the promotional agreement. Under the promotional agreement, which was this really very small agreement relative to Black Card's much bigger marketing agreement with Barclays, the consideration that was exchanged is that Visa would make incentive payments and Black Card would keep its card exclusively on Visa Network. But that was the exchange that was happening there. So Visa's primary obligation is to make incentive payments. And twice, in writing, at this same time, Visa has told Black Card, when this agreement expires, we will not continue to make incentive payments. So with respect to its primary obligation under this agreement, it has said we are not going to continue to do this. And let me point to those specific communications. First, there's an email in early December 2013, and that's at Supplemental Appendix 417, 418, where Visa says to Black Card, you know, if we don't have a new written agreement executed by the end of March, your payments will be interrupted, okay? So we have to have a new agreement in place if we're going to continue to make these incentive payments. And then, of course, I think as one of you pointed out just now, after the agreement expired, we then send another email and we say, this is your last payment under our expired agreement. And I understand what they're saying, that, oh, well, we're talking about the expired agreement. But to try to read that email to say, well, our agreement, it says our agreement's over. We're not going to make any more payments. To read that as, oh, but we have an implied contract under which we're going to continue to make payments. I think those are fundamentally opposite things. Right. But is that what they have to prove here? And just isn't that a jury question? I mean, we're talking about summary judgment here. You're being very detailed in your explanation and putting a lot of things in there. But isn't that just a jury question? Well, I don't think so, Your Honor, because I don't think it's quite that detailed. I think we have two clear writings where Visa says, we are not going to continue to pay you. We are not going to continue to do the main thing that we have to do under this promotional agreement. And I want to point the Court to the Bustamante case, because in that case, what it says is where a party has manifested its intent to not enter an agreement without a writing, that is dispositive of whether there is an implied contract that's available. And here we've said that. Counsel, we're here on a summary judgment, and we've got to look at this in the most favorable light to the non-moving party. And I'm really hung up on the words, continue the business as usual. All the rest of the issues, I'm not too concerned about those. But everything you're telling me in regards to that, it is a material fact that a jury might need to get the chance to hear. So you need to really, for me personally, bear down on why that is not a jury question. I understand your argument. I understand it. Nobody agrees, so it's a factual issue. Why doesn't the jury get to decide that? Right. Well, let me put it in this context. I think it's undisputed that Visa said, we won't continue to perform, and then they did nothing ever to continue to perform. I agree. Nor did Black Card ever demand any performance. I think it's also undisputed that Black Card stopped performing when it went off to negotiate its deal with MasterCard. I agree. So now we're looking at, well, what does business as usual mean? And I would say, even if you had a straightforward, no other details around business as usual, that wouldn't be enough to get over the very clear statements. It wouldn't be more than a scintilla of evidence to get over the fact of the clear communications that we weren't going to perform and that nobody did continue to perform. However, we don't even have in that email something that rises to that level, because you do have to look at those words in the context that they're written. And you do, for an implied contract, have to have a clear manifestation of intent to continue. And when you look at those words in that email, they are very specific to a marketing channeling procedure. Well, tell me, what does continue business as usual then just mean to you as a lawyer? Well, I think it's clear what it means in the email. No, as a lawyer, I'm not talking about an email. I'm saying that's language that's used and it has a power, and you're an attorney. When I tell you we're going to do business as usual, it's got to mean something. Well, I guess I disagree, Your Honor. I don't think those words have very clear meaning outside of the context that they're used. Then who gets to decide what the meaning means? Well, I think here the email tells us what it means, because it says continue to run your materials past Barclays. And let me use that, because that email is talking about review of marketing materials. And Black Card has tried to make the case that because Visa continued to review marketing materials, that that was a continued performance of the promotional agreement. But it's not. Visa has the right to review marketing materials regardless of whether there's any promotional agreement. And so when you look at this email that is specific to marketing, which is a right that Visa has totally independent of any promotional agreement, it just doesn't rise to the level to overcome what the parties undisputedly did and what Visa undisputedly said about whether it was going to continue to perform. And, you know, there are, I think, two other business as usual emails that come much later. They aren't communications to Black Card. They are from Visa to Barclays. But what you'll see when you look at those is they are exactly the same. They are very specific to how are we sending our marketing materials through the channels for review. And just to come back to Mr. Clement's point that, well, this was a service that was valuable to Visa. Well, certainly Black Card can't voice the contract onto Visa through its unilateral conduct. But I also want to make sure that it's clear that Black Card was obligated under its agreement with Barclays, its separate agreement, which it had already renewed, it was obligated to continue marketing its card. That was the whole reason for its business. And, of course, it was incredibly lucrative to Black Card to continue to market its card, regardless of whether it had this little extra add-on agreement with Visa. And so this would really be the tail wagging the dog to suggest that Black Card would have been motivated only to proceed in marketing if it had this little extra agreement with Visa. It's not logical when you look at the scope of its agreement with Barclays. It was contractually obligated to Barclays to do this marketing. And so, you know, the fact that it had no agreement with Visa just doesn't, it's not irrelevant. Let me turn, I want to come back to your point, Judge Eyde, on the waiver with respect to the express contract claim. Because I think if we, I want to add a few more details from the record here. And, you know, as I look at it, the point of waiver and why the court doesn't consider arguments not presented in the district court is because it's not fair to Visa and it's not fair to the district court to be tasked with responding to arguments that they didn't have a chance to develop below. And here, when you go back and you look at how Black Card pled its breach of express contract claim, what it says is there was an unreasonable delay. That's what it says in its complaint about the breach of contract claim. Visa asked Black Card in discovery, what is the basis for that breach of contract claim? And they said, see our complaint. Of course, then we took the deposition and the 30B6 deposition of Black Card and we asked, what is the basis for the breach of the express contract claim in this December 2013 period? And the answer was, I don't think there was a breach. We moved for summary judgment on the claim. And in the summary judgment response, there is one sentence of argument that says there was, the materials were unreasonably rejected. And then, of course, at the summary judgment hearing, Judge Scavdall presses on this point and says, wait, where is the rejection? And Black Card's lawyer says, it's in the record, but I'm not sure where it is. And on that record, we had no way, Visa had no way to defend this notion that their hold the presses was not an unreasonable withholding of approval. And so we do think that that argument has been waived. We didn't have an opportunity to respond to it. The district court judge didn't have an opportunity to consider it. Well, how about the fact that they did cite the exhibit and the only thing apparently in that exhibit is hold the press? That's true, Your Honor. I would just say, given the history of the discovery and how that argument had been made in the summary judgment briefing and the fact that the 30B6 witness could not identify a breach at the summary judgment hearing, the Black Card's attorney could not identify that particular exhibit to support the breach. There just wasn't an opportunity to make this argument or to develop any discovery about it from Visa's point of view. And so I think the mere citation in the statement of facts to one piece of evidence in the record is not sufficient. Well, and they do cite it in the argument. It's just cited as an exhibit. Isn't that correct? I don't think that's correct, Your Honor. I believe that in the argument on breach of express contract and their summary judgment response, there is no citation to anything. There is one sentence that says there was an unreasonable rejection with no citations. And then again, to come to the merits of that argument, they submitted their materials. We responded within minutes and said, hold the presses. We'll give you a shout, clearly inviting a discussion of this. And then, of course, they submitted revised materials shortly thereafter, which we discussed and then approved. And that's exactly how this contract provision was supposed to work, was to allow the parties to work out any differences. Now, had they really believed that it was an unreasonable rejection of their materials, when we sent that hold the presses email and that we were breaching the contract, they had to give notice of that and give us a chance to cure. And, of course, no one from Blackheart ever said that's unreasonable, that's a breach. And, of course, you know, when pressed to deposition, the 30B6 witness could not identify any breach. I want to come back to, you know, in this case, Visa clearly told Blackheart it was not going to continue incentive payments without a new written agreement. It told them that the agreement was over, that the last payment had been made. Visa never performed any further obligations to make any payments. Blackheart never demanded that Visa make any further payments. And Blackheart almost immediately went off to negotiate a new deal with MasterCard. Now, under those undisputed facts, summary judgment is appropriate on the implied contract claims, as well as the estoppel and unjust enrichment claims. And for the reasons we talked about with respect to the breach of express contract, we believe it's waived, but also that the undisputed evidence shows that there was no breach. Thank you. Thank you. Thank you, Your Honors. Just a few quick points in rebuttal. The first is critical, which is, Visa has the strategy of saying that the business as usual only stems from this February email. And that is just contrary to the record. The business as usual reference that's probably the single most important one is from the deposition testimony of Blackheart's CEO, which is at appendix page 251, where he says that in December of 2013, when he inquires about where is the new promotional agreement for next year, he's told, you know, it's basically done, we've got to get it by legal, but in the interim, business as usual. So that's not constrained to marketing, and since it's directly in the context of, hey, where's the new language, where's the new written agreement, that seems far more important than the February email, which, of course, is corroborative, but I wouldn't let them get away with focusing just on that February email. It's A251 is the single most important testimony on that. The second point I'd like to make is the continued performance throughout 2014. Now, they want to say that the marketing is done just pursuant to the brand standards, or we'd have to do it anyways. That is a factual dispute, and it's inconsistent with the record. As I noted earlier, as late as November 2014, Barclays is getting approval for this materials, and it's referencing the business as usual protocols. So that's one way there's continuing performance. Excuse me, counsel. Did your client continue to receive compensation from Visa after that you will receive no more payments from us? Thank you for asking that. The answer is they didn't, but they wouldn't have been entitled to any compensation under the promotional agreement. The promotional agreement itself provided for an annual payment based on the annual-to-annual growth. So the reason they're getting the 2013 payment in February of 2014 is because that's when it's due. So the payment that we would be entitled to, we would not have been in a position to make a demand for it until February 2015 when this litigation is already filed. So that's another place where Visa wants to say, hey, there's a dog that didn't bark here. They didn't demand payment. The payments wouldn't have been due until 2015. Thank you, Your Honor. Thank you. Thank you both for your arguments this morning, and the case is submitted.